STATE OF LOUISIANA

COURT OF APPEAL, THIRD CIRCUIT

14-36

STATE OF LOUISIANA

VERSUS

JOSEPH DEVIN DELACERDA

\*\*\*\*\*\*\*\*\*\*
APPEAL FROM THE
TENTH JUDICIAL DISTRICT COURT
PARISH OF NATCHITOCHES, DOCKET NO. C 17316A
HONORABLE ERIC ROGER HARRINGTON, DISTRICT JUDGE
\*\*\*\*\*\*\*\*\*\*

SYLVIA R. COOKS
JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Sylvia R. Cooks, Marc T. Amy, and James David Painter Judges.

AFFIRMED.

Paula C. Marx
Louisiana Appellate Project
P.O. Box 80006
Lafayette, LA  70598-0006
ATTORNEY FOR DEFENDANT/APPELLANT
Joseph Devin Delacerda

James D. "Buddy" Caldwell, Louisiana Attorney General
Clifford R. Strider, III, Assistant Attorney General
P.O. Box 94005
Baton Rouge, LA  70804
(225) 326-6500
ATTORNEY FOR APPELLEE
State of Louisiana

**Cooks, J.**

## FACTS AND PROCEDURAL HISTORY

On September 26, 2010, at approximately 8:30 a.m., Joseph Devin Delacerda (Defendant) was driving Miss Lauren Delrie's (Delrie) Honda Accord in which she was an occupant. Defendant was traveling at a speed in excess of 70 m.p.h. on rural Highway 490 in Natchitoches Parish when he lost control of the vehicle and hit a tree. He had a blood alcohol level of 0.13 percent at the time of the crash. Delrie died at the scene as a result of the injuries she sustained in the one-car crash. As a result of his severe injuries Defendant had no recollection of the accident.

Defendant was charged by bill of information on December 7, 2010, with vehicular homicide, a violation of La.R.S. 14:32.1, and reckless operation of a vehicle, a violation of La. R.S. 14:99. He entered a plea of not guilty on December 13, 2010. On May 4, 2011, the State dismissed count two of the bill of information. On May 13, 2011, Defendant filed a motion to appoint a sanity commission to determine his capacity to proceed. The trial court granted Defendant's motion, and on June 20, 2012, Defendant was committed to the custody of the Louisiana Department of Health and Hospitals, Eastern Louisiana Mental Health System Forensic Division (D.H.H.) because he lacked the mental capacity to understand the proceedings against him and assist in his own defense. On January 7, 2013, a review of Defendant's capacity to proceed was conducted and the trial court found Defendant competent to stand trial.

On May 9, 2013, Defendant pled guilty to vehicular homicide. A sentencing hearing was held on August 9, 2013, and Defendant was sentenced to serve twelve years at hard labor, with ten years of the sentence to be served without benefit of probation, parole, or suspension of sentence, and to pay a fine of $3,000.00.

Defendant appeals his sentence asserting three assignments of error: 1) the trial court erred in imposing a twelve-year sentence because Defendant suffered a traumatic brain injury in the crash and will never be the same mentally again; 2) the trial court failed to particularize his sentence; and 3) the trial court erred in classifying the crime in this case as a crime of violence.

**ERRORS PATENT**

In accordance with La. Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record we find there is an error patent.

The trial court erred in ruling on the State's Motion to Place Additional Conditions on Bond while the issue of mental capacity to proceed was pending. Louisiana Code of Criminal Procedure Article 642 (emphasis added) states:

> The defendant's mental incapacity to proceed may be raised at any time by the defense, the district attorney, or the court. When the question of the defendant's mental incapacity to proceed is raised, *there shall be no further steps in the criminal prosecution, except the institution of prosecution,* until the defendant is found to have the mental capacity to proceed.

On May 13, 2011, Defendant filed a Motion to Appoint Sanity Commission/Determine Mental Incapacity to Proceed. Three days later, the court ordered a mental evaluation and set the matter for a hearing on June 15, 2011. On that date, defense counsel appeared in court and stated he had spoken with the prosecutor and the State had no objection to the appointing of a sanity commission. On June 27, 2011, the court issued a written order appointing a sanity commission. On August 29, 2011, the State filed a motion requesting an independent mental examination of the Defendant which was granted by the court on August 30, 2011. On April 23, 2012, as a result of information obtained during the mental evaluations of Defendant, the State requested the trial court place conditions on

Defendant's bond. A hearing on the matter was held May 25, 2012. The court removed Defendant's "release on his own recognizance bail status" and remanded Defendant to the sheriff's custody. On June 20, 2012, Defendant was committed to the D.H.H. On January 7, 2013, Defendant was found to have the capacity to proceed to trial as a result of the treatments received in the facility.

In *State v. Young*, 576 So.2d 1048, 1062-63 (La.App. 1 Cir.), *writ denied*, 584 So.2d 679 (La.1991) (footnote omitted), the first circuit stated the following:

> We also note that further proceedings in the prosecution were conducted in the interim between the appointment of the sanity commission (March 13) and the ruling that the defendant had the capacity to proceed to trial (May 3). *See* La.C.Cr.P. art. 642. On April 4, 1989, the motion to suppress hearing was resumed and one defense witness testified. Thereafter, the motion to suppress was again continued. On the same date, the State amended the indictment from first degree murder to second degree murder, and the trial court fixed bond. On May 3, before ruling on the defendant's capacity to proceed to trial, the trial court issued a ruling denying the defendant's motion to suppress and allowed the defendant to be rearraigned on the amended charge of second degree murder.

> While Article 642 permits the institution of prosecution in the interim between the appointment of a sanity commission and the ruling thereon, no provision is made for the amendment of an indictment or bill of information. In any event, assuming it was patent error to allow the filing of an amended charge, we find such error is not reversible. The reduction of the charge to second degree murder clearly benefitted the defendant by eliminating the possibility of a death sentence upon conviction. Likewise, if patent error occurred when the trial court fixed bond, the fixing of a bond on a reduced charge is also favorable to the defendant and cannot be deemed reversible patent error.

> The motion to suppress hearings were held on four different dates, and the ruling thereon was issued on May 3. Although it was patent error to resume the motion to suppress hearing on April 4, we note that only one witness, a defense witness, testified on this date. We find no reversible error. Furthermore, while the trial court issued a ruling denying the motion to suppress on May 3, the same date as the ruling on the defendant's capacity to proceed, the motion to suppress ruling came immediately before the capacity to proceed ruling and, therefore, technically was patent error. However, since the rulings on the motion to suppress and the defendant's capacity to proceed were issued in the same hearing, we find no reversible error.

Finally, the trial court permitted the defendant to be rearraigned on the charge of second degree murder on May 3, but it did so immediately before the ruling on the defendant's capacity to proceed. Again, although we find patent error in the rearraignment, we find no reversible error. The defendant entered a plea of not guilty and did not object to the rearraignment occurring before the capacity to proceed ruling. *See* La.C.Cr.P. art. 841; *State v. Beauchamp,* 510 So.2d 22, 29 (La.App. 1st Cir.), *writ denied,* 512 So.2d 1176 (La.1987).

In *State v. Francois*, 05-1385, pp. 2-3 (La.App. 3 Cir. 4/5/06), 926 So.2d 744, 747, *writ denied*, 06-1048 (La. 1/12/07), 948 So.2d 138, this court addressed a similar issue:

> All appeals are reviewed for errors patent on the face of the record. Review of the record revealed two errors patent. The first error patent involves actions taken between the appointment of a sanity commission on July 14, 2003, and the trial court's determination on December 15, 2003, that Defendant was capable of proceeding. According to La.Code Crim.P. art. 642, "[w]hen the question of the defendant's mental incapacity to proceed is raised, there shall be no further steps in the criminal prosecution, except the institution of prosecution, until the defendant is found to have the mental capacity to proceed."
>
> A number of "steps" were taken during the pendency of the commission, including Defendant's arraignment, where he pled not guilty; the filing of several motions by Defendant; hearings on some of the motions filed by Defendant; and the filing of writ applications with this court which were addressed. The sanity commission panel members issued their findings that Defendant was capable of proceeding to trial on September 29, 2003 and October 23, 2003, and on December 15, 2003, the trial court found Defendant capable of proceeding to trial.
>
> In *State v. Davis*, 94-2332 (La.App. 1 Cir. 12/15/95), 666 So.2d 400, *writ denied*, 96-127 (La.4/19/96), 671 So.2d 925, the court determined that an arraignment and a pretrial conference being held during the pendency of a sanity commission were harmless errors because they occurred before the defendant pled guilty and because the defendant did not allege that he was prejudiced by the trial court's failure to comply with the requirements of Article 642. In *State v. Karam*, 02-163 (La.App. 3 Cir. 7/31/02), 834 So.2d 1003, this court concluded that motion hearings held during the pendency of a sanity commission were harmless error[s], as the hearings did not prejudice defendant. The court explained that the purpose of Article 642 is to insure that no action prejudicial to the defendant is taken while the sanity commission is pending.

4

Not all of the motions Defendant filed were resolved in his favor; however, they were pretrial in nature and were not prejudicial to him. Furthermore, Defendant does not allege that he was prejudiced by the occurrence of these "steps" during the pendency of the sanity commission. We find any error was harmless. *See State v. Prudhomme*, 99-2029 (La.App. 3 Cir. 6/5/02), 819 So.2d 443, *writ denied*, 02-2073 (La.6/27/03), 847 So.2d 1251.

We find that the court's error in changing Defendant's bail status and remanding him to the custody of the sheriff harmless in this case. Defendant does not allege he was prejudiced by the occurrence of this step prior to the court's finding he had the capacity to proceed to trial.

## ASSIGNMENTS OF ERROR NOS. 1 & 2

In his first assignment of error, Defendant contends it is a needless imposition of pain and suffering to impose a twelve-year hard labor sentence on a twenty-four-year-old defendant who has suffered a traumatic brain injury in the crash which killed the occupant in the car he was driving. In his second assignment of error, Defendant contends the trial court failed to particularize the sentence to him thus violating the guidelines of La.Code Crim.P. art. 894.1.

At the time sentence was imposed defense counsel entered only a general objection thereto and failed to file a motion to reconsider sentence. In *State v. Barling*, 00-1241, 00-1591, pp. 10-11 (La.App. 3 Cir. 1/31/01), 779 So.2d 1035, 1041-42, *writ denied*, 01-838 (La. 2/1/02), 808 So.3d 331 (emphasis in original), this court discussed the review of sentences in such cases as follows:

> The failure to timely file a written motion to reconsider sentence or to orally urge any specific ground for reconsideration at sentencing precludes a defendant from objecting to the sentence imposed. *State v. Moore*, 98–1423 (La.App. 3 Cir. 3/3/99); 734 So.2d 706. *See also State v. King*, 95–344 (La.App. 3 Cir. 10/4/95); 663 So.2d 307, *writ denied*, 95–2664 (La.3/15/96); 669 So.2d 433. La.Code Crim.P. art. 881.1 (emphasis added) serves as the basis for this restriction and provides, in pertinent part:
>
> A. (1) Within thirty days following the imposition of sentence or within such longer period as the trial court

may set at sentence, the state or the defendant may make or file a motion to reconsider sentence.

(2) The motion shall be oral at the time of sentencing or in writing thereafter *and shall set forth the specific grounds on which the motion is based*.

. . . .

D. Failure to make or file a motion to reconsider sentence *or to include a specific ground upon which a motion to reconsider sentence may be based, including a claim of excessiveness, shall preclude the state or the defendant from raising an objection to the sentence or from urging any ground not raised in the motion on appeal or review*.

In cases where courts have held that an oral objection alone is sufficient to preserve the issue for review, the oral objection contained the basis for the motion, such as excessiveness of sentence. *See State v. Caldwell*, 620 So.2d 859 (La.1993); *State v. Trahan*, 98–1442 (La.App. 4 Cir. 12/1/99); 752 So.2d 921. Therefore, since Defendant's oral motion did not set forth any specific grounds to support his claim of excessive sentences, we are relegated to a bare claim of excessiveness. *State v. Mims*, 619 So.2d 1059 (La.1993), *after remand*, 626 So.2d 856 (La.App. 2 Cir.1993), *writ denied*, 93–2933 (La.2/11/94); 634 So.2d 373.

Because defense counsel only entered a general objection in this matter, we are relegated to a bare claim of excessiveness.

La. Const. art. I, § 20 guarantees that, "[n]o law shall subject any person to cruel or unusual punishment." To constitute an excessive sentence, the reviewing court must find the penalty so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals and is, therefore, nothing more than a needless imposition of pain and suffering. *State v. Campbell*, 404 So.2d 1205 (La.1981). The trial court has wide discretion in the imposition of sentence within the statutory limits and such sentence shall not be set aside as excessive absent a manifest abuse of discretion. *State v. Etienne*, 99–192 (La.App. 3 Cir. 10/13/99); 746 So.2d 124, *writ denied*, 00–0165 (La.6/30/00); 765 So.2d 1067. The relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate. *State v. Cook*, 95–2784 (La.5/31/96); 674 So.2d 957, *cert. denied*, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996).

*Id.* at 1042-43.

> In deciding whether a sentence is shocking or makes no meaningful contribution to acceptable penal goals, an appellate court may consider several factors including the nature of the offense, the circumstances of the offender, the legislative purpose behind the punishment and a comparison of the sentences imposed for similar crimes. *State v. Smith*, 99-0606 (La.7/6/00); 766 So.2d 501.

*State v. Smith*, 02-719, p. 4 (La.App. 3 Cir. 2/12/03), 846 So.2d 786, 789, *writ denied*, 03-562 (La. 5/30/03), 845 So.2d 1061.

Defendant pled guilty to vehicular homicide, an offense punishable by a fine of not less than $2,000.00 nor more than $15,000.00, and imprisonment with or without hard labor for not less than five years and not more than thirty years, with at least three years of the sentence to be imposed without benefit of probation, parole, or suspension of sentence. La.R.S. 14:32.1(B). Defendant was sentenced to serve twelve years at hard labor, with ten years of the sentence to be served without benefit of probation, parole, or suspension of sentence, and to pay a fine of $3,000.00.

At the sentencing hearing, the State informed the trial court that Defendant was on probation when he committed the instant offense. Additionally, after he was arrested for the instant offense, he was released on a recognizance bond, and "[h]is actions while he was out on bond were sufficient, that this [c]ourt felt it was necessary that he be incarcerated." Defense counsel informed the trial court Defendant had a problematic brain injury with a GAF score of sixty, an IQ of approximately 75, and dementia secondary to a traumatic brain injury that is chronic.[1] Defense counsel also stated Defendant suffered from chronic pain and further noted Defendant's condition did improve while he was at the D.H.H. facility, East Feliciana. Additionally, Defense counsel pointed out to the trial court that Defendant took responsibility for his actions.

---

[1] GAF stands for global assessment function. There was no explanation of the Defendant's GAF score at the sentencing hearing.

7

After recessing to consider the matter, the trial court articulated in detail its rationale for the sentence imposed:

The relevant history of the case is as follows. Mr. Delacerda is twenty-four (24) years of age. He was born to parents who were not married. And he and his biological father have never had a relationship. His mother married Jonathan Delacerda, when Joseph was two (2) to three (3) years old, and Mr. Delacerda adopted Joseph. His mother and Jonathan were subsequently divorced. On his first day of school in the ninth grade at Winnfield High School, Joseph was suspended for possessing brass knuckles. He was placed in the youth challenge program, completed the program, and earned his GED. On July 14, 2008, when he was 19, Joseph was arrested on a felony grade criminal damage to property charge. He pled guilty on March 6, 2009, received a deferred sentence, and was placed on two (2) years supervised probation. On September 26, 2010, when he was 21, he was driving a vehicle with Lauren Delrie as a passenger. The vehicle left the highway, struck a tree, and Lauren was killed. Tests revealed that Joseph had a blood-alcohol concentration of .13 g. Tests also revealed that Lauren had a blood alcohol concentration of .11 g. Therefore both were legally intoxicated. Neither Joseph nor Lauren was wearing a seatbelt at the time of the accident. The State Police determined that the vehicle was traveling a little over 73 mph, immediately prior to leaving the rural highway. Joseph was severely injured in the accident, was in a coma for a period of time, and was hospitalized until December 2, 2010. He was arrested and charged with vehicular homicide, DWI first offense and reckless operation, and was released on bond. Subsequently the State filed a Bill of Information formally charging him with Vehicular Homicide and Reckless Operation. On May 25, 2012 is [sic] bond was revoked after a hearing in which the Court heard allegations that he had been consuming alcoholic beverages and was not being supervised by his family. Subsequently a bond of $250,000 was set, which Joseph was unable to make, and he has remained in custody. During that time the charges have been pending, a Motion for a Sanity Commission was filed. And the Court appointed two psychologists, Dr. George Seiden, and Dr. Richard Williams to examine Mr. Delacerda and file reports with the Court. Dr. Seiden interviewed Mr. Delacerda on July 19, 2011. His diagnostic impression was dementia, secondary to traumatic brain injury, alcohol abuse, and apparent remission, and bipolar disorder by patient history. He found his medical status, to be post severe traumatic brain injury. His GAF at that time was 45. He concluded that Mr. Delacerda did not have the ability to consult with his attorney with understanding. He did not understand the proceedings against him. He could not assist in his defense, he said. Dr. Seiden said that Mr. Delacerda's lack of capacity to proceed was caused by his traumatic brain injury from the accident and that at best he could determine this condition did not exist prior to the date of the accident. Dr. Williams also interviewed Mr. Delacerda on the same day. And his findings were essentially the same. As a result of the

8

doctors [sic] evaluations, the State filed a Motion to have Mr. Delacerda committed to the East Louisiana (sic) Mental Health Facility in Feliciana. He was admitted to the facility on July 11, 2012[,] and remained there until discharged in December, 2012. During that time he received treatment in counseling. He cooperated in that process. Upon discharge, the medical opinion was given by staff there that he had the mental capacity to proceed, as he then understood the proceedings against him, and he had the ability to assist his attorney in his defense. Specifically the written evaluation of the facility indicated that his insight, judgment, and fund of knowledge were fair, and that other than moderate cognitive slowing, comparable to that of someone with mild, mental retardation, he had no psychiatric symptoms at that time and showed no psychiatric signs. Mr. Delacerda was placed, and to my knowledge, remains on Risperidone for stress and anxiety, Devapenton (phonetic) for neuropathic pain, and Trazadone (phonetic) for sleep. The Court concludes Dr. Seiden . . . and Williams, and the East Louisiana Mental Health Facility that as a result of the accident Mr. Delacerda was left in a mildly mentally retarded state. In determining the appropriate sentence for Mr. Delacerda, the Court has had the benefit of the filings in the records, the reports referred to above, the statements presented today, the bail hearing evidence, a pre-sentence investigative report, which I shared with counsel, and the well-made argument of counsel. The crime of vehicular homicide was created by the Louisiana Legislature. The Legislature also set the minimum and maximum penalty for the crime. … By its very definition, the crime of vehicular homicide involves the death of someone. Therefore, in each vehicular homicide case, the Judge is sentencing a defendant who has caused someone's death. It is very understandable that a family that has lost a loved one feels that the person committing the crime should get the max, because he took their loved one away from them. However, as I pointed out, in each case, vehicular homicide, a family has lost the loved one. In the crime of second degree murder, the Legislature set the penalty at a life sentence for the convicted person . . . no choice. Yet, as I just pointed out, the Legislature set a sentencing range for vehicular homicide of five (5) to thirty (30) years. That means that a Court cannot sentence a defendant to thirty (30) years, the maximum for vehicular homicide, just because they caused someone's death. As that happens in every vehicular homicide case. Instead, in providing a sentencing range, the Legislature was directing the Courts to assess a defendant's conduct in committing the crime, whether he had a lengthy criminal history, whether he showed remorse, and other aggravating and mitigating factors that might be appropriate. And then determine an appropriate sentence, within the sentencing range provided by the Legislature. The Higher Courts of this State, have also reviewed on appeal the sentences imposed by Court's [sic] of persons convicted of vehicular homicide, and each sentencing Court has the ability to review what sort of sentences the Higher Courts have previously approved and disapproved. Yet a sentence must be individualized to the particular offender and to the particular offense committed. The sentencing guidelines are set forth

in Code of Criminal Procedure Article 894.1, and I will consider them now. Paragraph A says that a Court should impose a prison sentence if any of the following exist. In the case of vehicular homicide, a prison sentence is mandatory, but I think it's helpful to review these factors anyway, because their language is applicable here, and I have taken them into consideration in determining the length of the sentence to be imposed. One, there is an undue risk that during the period of a suspended sentence or probation, the defendant will commit another crime. I am of the opinion that this is true of the defendant. While on felony probation, he committed this crime. While out on bond on this crime, he continued to consume alcoholic beverages and conduct himself inappropriately to the extent that I revoked his bail in the interest of public safety. The defendant is in need of correctional treatment or a custodial environment that can be provided most effectively by his commitment to an institution. Based on the bond hearing, and even after today's hearing, I have no confidence that the defendant is prepared to live a stable functional life on his own at this point. And I see in sufficient [sic] family support to ensure that would happen. He has frankly done better since he was incarcerated and he continues to need correctional treatment and a custodial environment, in my opinion. Additionally, number three, a lesser sentence than I impose today would deprecate the seriousness of the defendant's crime. The sentence, I do impose in my opinion, recognize [sic] the seriousness of this crime. Other aggravating factors that I find are as follows. He created a risk of death or great bodily harm, not just to . . . to not just himself and Lauren but to others in oncoming vehicles, by operating a vehicle while intoxicated at a high rate of speed on a rural highway.  Significantly, while Lauren may have also been intoxicated, she did not choose to get behind the wheel that morning, he did. This was not his first felony offense. He was already on probation and does not appear to have been rehabilitating himself, at least as far as committing this crime indicates. His conduct while out on bail did not indicate that he was trying to change his life. He has caused immeasurable grief, distress, and suffering to Lauren [sic] family. When I practiced law, I represented parents who lost two children in tragic incidents. I do not believe there is a greater grief for a parent than the loss of a child. We all want to believe in the normal order of life and pray that we will go before our children do. Factors that I have considered in mitigation are as follows. While on bail, his girlfriend became pregnant with his child, which has now been born. That child and her mother will be without him during his period of incarceration. Joseph Delacerda has been punished by his own actions. It cannot in any way compare with Lauren's [sic] death. But as a result of his actions, and whatever he was before the accident, he is now a mentally retarded man and he will be for the rest of his life. He did express remorse is his statement in the pre-sentence report. I do not fine [sic] that home incarceration is appropriate for Mr. Delacerda, even if you would otherwise be eligible. His prior history, while on bail, does not give me comfort that he would be compliant. Additionally, for the reasons I have already expressed, a more custodial environment is appropriate. And regardless of Mr.

Delacerda's physical and mental condition today . . . which I have taken into consideration in determining the length of sentence, there is [sic] still consequences to his actions.

Defendant asserts he was not competent at the time his bond was revoked, and he was incapable of trying to change his life at that point. He also notes his competency was restored after a long hospital stay, he better understands his limitations now, and he does not have a drivers' license and probably never will. Defendant further claims the trial court's reference to its prior representation of parents who lost two children in tragic accidents was a clear expression of the trial court's personal feelings, and such cannot justify a sentence imposed in a court of law. He cites the trial court's statement that it had no confidence that he was prepared to live a stable, functional life on his own at that point. Defendant asserts the lines between the necessity of custodial incarceration and the need for assistance for dementia are blurred in this case. He asserts that alternatives such as group homes and day programs may be available and should have been considered by the trial court. He argues that twelve years incarceration for a man suffering from intellectual incapacity makes no measurable contribution to acceptable penal goals and is, therefore, nothing more than the needless imposition of pain and suffering.

In *State v. Franco*, 08-1071, pp. 4-5 (La.App. 3 Cir. 4/1/09), 8 So.3d 790, 793, *writ denied*, 09-1439 (La. 2/12/10), 27 So.3d 843, this court discussed the nature of the offense of vehicular homicide as follows:

> The crime at issue here is vehicular homicide, which carries a maximum sentence of thirty years at hard labor. La.R.S. 14:32.1. In 2004, the legislature increased the maximum penalty for vehicular homicide from twenty years to thirty years, demonstrating its intent to convey the serious nature of this crime. *State v. Morain*, 07–1207 (La.App. 3 Cir. 4/2/08), 981 So.2d 66. Then, in 2006, the minimum penalty for vehicular homicide was increased from two years to five years at hard labor, and the minimum number of years required to be imposed without benefit of probation, parole, or suspension of

11

sentence was increased from one year to three years, further evidencing the legislature's intent to convey the seriousness of this offense.

In this case, the offense caused the untimely death of twenty-one-year-old Lauren Delrie which, as aptly state by the trial court: "caused immeasurable grief, distress, and suffering to Lauren['s] (sic) family."

In *State v. Blackwell*, 13-316 (La.App. 3 Cir. 10/9/13) (unpublished opinion), writ denied, 13-2600 (4/11/14), __ So.3d__, the defendant, a nineteen-year-old chaplin's assistant in the United States Army, and father of one child, was convicted of vehicular homicide. The defendant was driving ninety-nine miles per hour on Highway 171 south, failed to apply his breaks, and hit a pedestrian, causing the pedestrian's death. At the time of the accident, the defendant's blood alcohol level was 0.111. He pled guilty to vehicular homicide and was sentenced to serve ten years at hard labor. This court affirmed the first offender's sentence, finding it was not excessive.

In *State v. Gumto*, 10-876 (La.App. 4 Cir. 4/13/11) (unpublished opinion), *writ denied*, 11-998 (La. 11/18/11), 75 So.3d 449, the defendant was convicted of vehicular homicide. While riding his motorcycle, the defendant turned to speak to his passenger, with whom he was arguing, and struck a concrete curb. The passenger was thrown from the motorcycle and died due to extensive brain damage. His blood alcohol level was 0.923. The fourth circuit affirmed the defendant's thirteen-year sentence, of which ten years was to be served without benefit of probation, parole, or suspension of sentence. In reaching its conclusion, the fourth circuit cited the following cases:

> Similar sentences have been upheld on appeal. In *State v. Rodrigue*, 2000–1369 (La.App. 4 Cir. 6/13/01), 789 So.2d 729, this court affirmed a fifteen year sentence for vehicular homicide.[3] The Second Circuit affirmed a sentence of fifteen years at hard labor for a first offender found to have disregarded public safety by speeding.

> *State v. Lanham*, 31,791 (La.App. 2 Cir. 3/31/99); 731 So.2d 936. See also *State v. Baker*, 31,162 (La.App. 2 Cir. 10/28/98); 720 So.2d 767 (first offender's fifteen year sentence at hard labor on each of three counts of vehicular homicide affirmed on appeal). The First Circuit upheld a ten-year sentence at hard labor for a first offender guilty of vehicular homicide where the appellant's actions demonstrated a reckless disregard for the safety of others. *State v. Trahan*, 93–1116 (La.App. 1 Cir. 5/20/94), 637 So.2d 694.
>
> _____
>
> [3]This court affirmed similar sentences in unpublished opinions. A ten year sentence at hard labor was affirmed in *State v. Jackson*, unpub., 99–0783 (La.App. 4 Cir. 12/22/99). A fifteen year sentence at hard labor was affirmed in *State v. Nabors*, unpub., 96–1427 (La.App. 4 Cir. 6/18/97).

*Id.* at 8. (This case can be found by using Westlaw citation 2011 WL 9160380.)

In *State v. Kotrla*, 08-364 (La.App. 3 Cir. 11/5/08), 996 So.2d 1224, the defendant was convicted of vehicular homicide after he struck another vehicle, causing the death of the passenger in that vehicle. The defendant was a first-offender whose blood alcohol level was more than twice the legal limit. He was sentenced to sixteen years at hard labor, with the first five years to be served without benefit of parole.[2] This court affirmed the defendant's sentence.

The Defendant in the case at bar was a second offender and received a sentence that was two years more than Blackwell's sentence. Blackwell was a first offender. The fourth circuit discussed sentences for first offenders in its analysis in *Gumto*, 10-876; thus we can surmise Gumto was a first offender. Gumto was sentenced to serve one year more than Defendant in the case at bar. The sentence received by Kotrla, who was a first offender, was four years more than that received by Defendant, however, Defendant is required to serve ten years of his sentence without benefits whereas Kotrla was required to serve five years of his sentence without benefits. Thus it is clear the sentence received by Defendant in the case at bar is comparable to those received by first offenders though he is a second offender.

_____

[2]At the time of the commission of the offense, the penalty for vehicular homicide was imprisonment for two to thirty years.

Based on the trial court's lengthy discussion at the sentencing hearing we conclude the trial court sufficiently particularized Defendant's sentence. After considering the nature of the offense, Defendant's particular circumstances, and a comparison of the sentences imposed in other vehicular homicide cases, we find the trial court did not abuse its discretion when imposing a sentence of twelve years at hard labor without benefit of probation, parole, or suspension of sentence in the case at bar. Defendant's first and second assignments of error lack merit.

**ASSIGNMENT OF ERROR NO. 3**

In his third assignment of error Defendant contends the trial court erred in classifying the crime in this case as a crime of violence.

In *State v. Oliphant*, 12-1176, pp. 1-2 (La. 3/19/13), 113 So.3d 165, 166, (emphasis added) the Louisiana State Supreme Court discussed the facts of the case as follows:

> While driving his vehicle in a highly intoxicated state, defendant, Craig Oliphant, struck and killed a pedestrian, Cravis M. Scott, and subsequently pled guilty to the charge of vehicular homicide. The District Court ultimately sentenced defendant to twenty-five years at hard labor, with the first fifteen years without benefit of probation, parole, or suspension of sentence, and designated the offense a crime of violence. The appellate court affirmed the conviction, reversed the portion of the sentence designating vehicular homicide a crime of violence, vacated the twenty-five-year sentence, and remanded the matter for resentencing. We granted this writ to provide guidance to the lower courts regarding whether the offense of vehicular homicide fits the general definition of a crime of violence under La.Rev.Stat. § 14:2(B). *State v. Oliphant*, 12-1176 (La.11/9/12), 100 So.3d 822. *For the following reasons, we find the offense of vehicular homicide is a crime of violence pursuant to La.Rev.Stat. § 14:2 as the offense involves the use of physical force and the substantial risk that force will be used against another person in the commission of the offense as well as the use of a dangerous weapon.* Finding no error in the District Court's designation, we reverse the judgment of the Court of Appeal, vacate defendant's sentence, and remand this matter to the District Court for resentencing.

The supreme court then found:

No evidence suggests the defendant in the present case deliberately ran down the victim and his friend as they stood off the highway by the mailbox of the home occupied by the victim's mother. Nevertheless, the evidence does show defendant, with a spectacularly high blood alcohol content of .247g%, veered out of his lane of travel, drove along the fog line, and sent both men flying into a ditch upon impact, killing one man and injuring another. Thus, the evidence leaves no doubt defendant, as previously noted, had the general criminal intent necessary to commit vehicular homicide when he drove his SUV in an extremely intoxicated state and struck the victim with sufficient force to kill upon impact. *Under these circumstances, we agree with the State that, in the manner of its use by its highly intoxicated driver, defendant's vehicle was a multi-ton instrumentality "likely to produce death or great bodily harm," and the offense of vehicular homicide is, therefore, a crime of violence.*

The District Court articulated this very rationale at sentencing when it observed defendant's actions were "no different from a person putting a bullet in a gun, pointing that gun at another human being, pulling the trigger, and killing that person. A gun is a dangerous weapon and so is a motor vehicle in the hands of an intoxicated person, especially one who was as intoxicated as [defendant] on the night of this tragedy."

Accordingly, we find, under the explicit and plain language of the relevant statutory provisions, *vehicular homicide does qualify as a crime of violence.* Therefore, because the District Court did not err in its designation, we reverse the ruling of the Court of Appeal to the contrary.

*Having found vehicular homicide is a crime of violence*, we must now address the corresponding sentencing consequences of that designation. In the present case, the District Court originally sentenced defendant to twenty-five years without parole eligibility, but reduced the term of parole ineligibility to fifteen years on reconsideration. *However, because vehicular homicide is a crime of violence, defendant must serve at least eighty-five percent of his full term before becoming eligible for early release on parole* pursuant to La.Rev.Stat. § 15:574.4(B)(1), which provides: "Notwithstanding any other provisions of law to the contrary, a person convicted of a crime of violence and not otherwise ineligible for parole shall serve at least eighty-five percent of the sentence imposed before being eligible for parole." Thus, by operation of law, defendant must serve at least twenty-one years and three months of his twenty-five-year sentence before becoming eligible for early release, not fifteen years as the District Court ordered on reconsideration.

Therefore, we find it necessary to vacate defendant's sentence and remand this matter to the District Court with instructions to reconsider defendant's sentence in view of the mandatory provisions on parole eligibility and early release for crimes of violence.

*Id.* at 173-74(emphasis added)

The issue of whether vehicular homicide is a crime of violence was raised in Defendant's presentence memorandum. Therein he alleged the offense should not be considered a crime of violence because *Oliphant* is distinguishable from this case in that it involved a pedestrian struck by a drunk driver. Additionally, he asserts that at the time he entered his plea he was under the impression that he was not pleading guilty to a crime of violence, and any sentence he would receive would be served under normal parole requirements without the necessity that he serve eighty-five percent of his sentence before becoming eligible for parole. He further asserted suspension of his sentence was not prohibited under La.Code Crim.P. art. 893.[3]

The issue was addressed by the parties at the sentencing hearing. The trial court noted that, at the time Defendant entered his plea of guilty the parties were not aware of the decision in *Oliphant*. Defense counsel argued the case at bar was distinguishable and that Justice Hughes' dissent in *Oliphant*, 113 So.3d 1065, should be determinative of the issue. The State argued the *Oliphant* decision should not be limited to the facts of that case. The trial court found the *Oliphant* decision is not limited to the facts of the case and under its holding vehicular homicide is a crime of violence. Defense counsel objected to the trial court's ruling.

Defendant was subsequently called to the witness stand and was questioned by the trial court. He was given the opportunity to withdraw his plea but he chose to move forward with sentencing. At the time Defendant was sentenced, the trial

---

[3]At the sentencing hearing, defense counsel noted Defendant was required to serve a minimum of three years.

16

court stated, "[t]his is a crime of violence which will require you to serve at least 85% of your sentence before you are eligible for early release on parole."

Defendant argues that a negligent act is not an intentional violent act and should not be considered a crime of violence. Defendant asserts the facts in *Oliphant* are clearly distinguishable from those in the case at bar as Oliphant's blood alcohol level was 0.247 when he struck a man standing on the shoulder of the road in front of his mother's residence. Defendant also notes Delrie was a passenger in the vehicle and her blood alcohol level was 0.11. Defendant argues there was no evidence of any intentional act to support the classification of the offense as crime of violence.

Prior to its repeal by 2011 La. Acts 186, effective August 15, 2011, La.Code Crim.P. art. 890.1 required the trial court to designate whether the crime involved was a crime of violence, which was the case at the time of Oliphant's conviction. However, as noted by our state supreme court in *Oliphant*, 113 So.3d at 169 n.1:

> In 2012 La. Acts 160, the Legislature completely rewrote La.Code Crim. Proc. art. 890.1 to provide a trial court with the authority to depart from a mandatory minimum term of imprisonment and/or to restore eligibility for parole, probation, or suspension of sentence otherwise denied by law under certain specified conditions in which the State, defendant, and the court agree to that result. As amended, however, La.Code Crim. Proc. art. 890.1(D) expressly excludes crimes of violence and sex offenses . . . .

The trial court was not required to designate the offense at issue a crime of violence. The trial court told Defendant the designation of the offense as a crime of violence would require him to serve at least eighty-five percent of his sentence before he was eligible for early release on parole. Additionally, we note that Defendant does not assert nor demonstrate any prejudice.

For the reasons as stated above, we affirm Defendant's sentence.

**AFFIRMED.**

17